

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-18-00453-CR

———————————————————

CHRISTY MICHELLE PRUITT, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 271st District Court
Jack County, Texas
Trial Court No. 4800

Before Sudderth, C.J.; Gabriel and Wallach, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

In January 2017, seventeen-year-old M.T.P. died after mixing his deceased step-grandfather's morphine tablets with Xanax. Before he went to his aunt's house to find the morphine tablets, M.T.P. spoke on the phone to Appellant Christy Michelle Pruitt, his mother, who then sent him the following text: "Don't let your Aunt Jennifer know what u r there for." About 20 minutes later, Appellant sent him another text, stating, "Take 1 now then in an hour and half u can take another one." M.T.P. took Xanax before leaving for his aunt's house, and he took nine morphine tablets when he returned home.

A jury found Appellant guilty of delivery of a controlled substance, found that she had used or exhibited a deadly weapon (morphine) during her commission of the offense, and found that the delivery of the controlled substance caused M.T.P.'s death or serious bodily injury. *See* Tex. Health & Safety Code Ann. § 481.122. The jury assessed her punishment at 35 years' confinement and a fine of $10,000. In three issues, Appellant challenges the sufficiency of the evidence to support the guilt and deadly weapon findings and the trial court's failure to order a venue change. Because the evidence supports the jury's findings, and because Appellant waived her right to a venue change, we affirm.

## Background[1]

Seventeen-year-old M.T.P. died on January 16, 2017, from an overdose of morphine and alprazolam, the active ingredient in Xanax. The morphine tablets had been prescribed to his step-grandfather while in hospice care. After his step-grandfather's death, M.T.P.'s aunt Jennifer, who had inherited the step-grandfather's house, hid the bottle of tablets in a utility closet. On the night before he died, M.T.P. went to the house, told Jennifer that he was looking for a bag belonging to his 14-year-old sister J.R.P., and took the morphine from the closet.

Before stopping by Jennifer's house, M.T.P. spoke to Appellant on the phone and, soon after, received the text from her that said, "Don't let your Aunt Jennifer know what u r there for," followed by the second text, "Take 1 now then in an hour and half u can take another one," sent 20 minutes later. M.T.P. had taken Xanax before going to Jennifer's house, and when he returned home, he took the nine morphine tablets. According to the medical examiner's report, M.T.P. died the next day "from the toxic effects of morphine and alprazolam."

Appellant filed a motion to change the trial's venue from Jack County to Wise County. *See* Tex. Code Crim. Proc. Ann. art. 31.03. Appellant did not request a hearing on the motion, and the trial court did not rule on it.

---

[1]Because Appellant's first issue contests the sufficiency of the evidence to support her conviction, we save a more detailed recitation of the facts for our discussion of that issue.

**Discussion**

## I. Sufficiency of the evidence as to guilt

In her first issue, Appellant argues that the evidence was insufficient to support a guilty finding.

## A. Standard of review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016).

To determine whether the State has met its *Jackson* burden to prove a defendant's guilt beyond a reasonable doubt, we compare the crime's elements as defined by the hypothetically correct jury charge to the evidence adduced at trial. *See id.*; *see also Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018) ("The essential elements of an offense are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Jenkins*, 493 S.W.3d at 599. The "law as authorized by the indictment" means the statutory

4

elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument. *See id.*; *see also Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements.").

## B. Proving delivery of a controlled substance

Appellant's indictment alleged that she had knowingly delivered, by actual or constructive transfer, morphine, a controlled substance, to M.T.P., who was younger than 18. *See* Tex. Health & Safety Code Ann. §§ 481.002(8), .102(3)(A), .122. "[O]ne method of constructive transfer is for the transferor to instruct the recipient on the location of the contraband. If the contraband is already in place, the constructive transfer is complete [when] the transferor gives the instruction." *Sims v. State*, 117 S.W.3d 267, 277–78 (Tex. Crim. App. 2003). Actual transfer occurs when the recipient then retrieves the contraband. *Id.* at 278.

## C. Relevant evidence

Appellant's and her sister Jennifer's stepfather had died at home in hospice care in May 2015. At the time of his death, their stepfather had had a prescription for 30 milligram morphine tablets. When he died, Appellant's mother told Jennifer, who lived with her, to hide the bottle containing the remaining morphine tablets until they could dispose of it. Jennifer put the bottle in a basket in a utility closet and put a large

5

metal bowl over the basket. This closet also had a refrigerator where drinks and snacks were kept, and it was accessible to anyone at the house. After their mother died suddenly in July 2015 after a stroke, Jennifer inherited her parents' house, and in late 2016, Jennifer allowed Appellant to move in with her. In January 2017, Appellant was still living with Jennifer.

Appellant had two children with her ex-husband David Pruitt—M.T.P. and J.R.P. After their 2014 divorce, David became managing conservator of the children. In 2017, David, a welder, was working on a project about 400 miles away from home and would typically be gone for five days at a time, leaving J.R.P. in M.T.P.'s care. On the evening of January 15, 2017, the children were with David at his house until he left for work around 8:00 p.m. After that, the children were home without adult supervision. Appellant was also out of town, in Midland.

After his dad left, M.T.P. took some Xanax and gave some to his sister.[2] Then around 9:00 p.m., M.T.P. stopped by Jennifer's house and, after telling her that he was there to pick up J.R.P.'s bag, he took the bottle of morphine pills from the utility closet.

After returning home, M.T.P. took nine tablets, and J.R.P. took five. He also gave seven tablets to his friend G.T., who had come to the house. The next morning, J.R.P. threw up and did not go to school. Instead, after speaking to her brother, she

---

[2]No evidence at trial explained the source of the Xanax.

went back to bed. Later that afternoon, M.T.P.'s best friend Z.H. came to the house and found M.T.P. dead in his bed. The medical examiner concluded that neither the morphine nor the Xanax would have been fatal on its own, but the synergistic effect of the two depressed M.T.P.'s respiratory system and caused his death.[3]

Appellant does not dispute that M.T.P. retrieved the morphine from Jennifer's house or that he took some upon returning home, but she argues that the evidence is insufficient to prove that he did so at her direction. To argue sufficiency of the evidence, the State relies primarily on three lines of evidence: (1) phone records for Appellant and M.T.P. (2) J.R.P.'s testimony about a phone conversation about the morphine that she overheard between M.T.P. and a woman who she thought was her mother, and (3) J.R.P.'s testimony that Appellant had instructed her to delete incriminating text messages from M.T.P.'s phone.

The phone record evidence included reports of call logs and texts extracted from M.T.P.'s and Appellant's phones. These reports showed that M.T.P. called Appellant at 8:18 p.m. on the night of January 15 and spoke to Appellant for about three minutes. He called her again at 8:45 p.m.; this call lasted only 28 seconds. One minute after that phone call, Appellant sent M.T.P the text instructing him not to tell

---

[3]While the medical examiner attributed M.T.P.'s death to a synergistic effect of morphine and alprazolam and testified that the morphine level in M.T.P.'s system was not considered a fatal amount, she also testified that she had no knowledge of M.T.P.'s tolerance level to morphine and if he had low tolerance, the nine tablets might have been a lethal dose.

his aunt about the purpose of his visit. At 8:47 p.m., M.T.P. called Appellant again; this call lasted 4 minutes and 36 seconds. He made a 50-second call to Appellant at 9:02 p.m., and two minutes later, Appellant texted M.T.P. to "[t]ake 1 now" and wait an hour and half before taking another. To that, M.T.P. responded, "Ok."

J.R.P., who was 16 at the time of trial, reluctantly testified about the events leading up to M.T.P.'s death. She explained that after her father left for work on the night of January 15, she took a Xanax that her brother gave her. M.T.P., who had also taken Xanax, then left the house with his friend G.T. and returned with the morphine. She stated that it was her brother's idea to get the morphine and that he "called someone about that." That someone was a woman who sounded like her mother, "but [she didn't] know for sure."[4]

After she, M.T.P., and G.T. took some of the morphine, M.T.P. and G.T. went to M.T.P.'s room to smoke marijuana. G.T. left the next morning. J.R.P. spoke to her brother then, and although he "just laid in bed," she said that he seemed like his normal self. Because J.R.P. did not feel well, she went back to sleep. M.T.P.'s best friend Z.H., who became concerned when M.T.P. was not at school that day, went to the house in the afternoon. When he could not awaken M.T.P., he woke up J.R.P.

___

[4]J.R.P. acknowledged that in two previous statements—one given to an investigator with the Jack and Wise Counties District Attorney's Office and the other given to an investigator with the Department of Family and Protective Services, Child Protective Services—she had identified that person as Appellant. But at trial she claimed that when she had given those two statements, she was angry and looking for someone to blame for M.T.P.'s death.

and told her about M.T.P. Z.H.'s father called,[5] and Z.H. told him that he could not wake M.T.P. Z.H.'s dad went to the house, tried to revive M.T.P. by using CPR, and called 911.

In the meantime, either Z.H. or J.R.P. called Appellant to tell her what was happening, and J.R.P. informed her mother that M.T.P. was not waking up.[6] J.R.P. testified that in the phone conversation, Appellant told her to get M.T.P.'s phone "because [Appellant] could get in trouble" and asked her to delete the texts she had sent to M.T.P. J.R.P. retrieved the phone from M.T.P.'s room, but she could not delete the texts because the phone battery was dead, so she put it on the top shelf of her closet. The phone was later found in a shoebox in the closet by her father.[7]

On cross-examination, J.R.P. testified that her father wanted to see her mother convicted and that he had told her that if her testimony at trial did not match her

---

[5]In his testimony, Z.H. did not explain why his father called.

[6]The trial testimony was contradictory about whether it was Z.H. or J.R.P. who called Appellant. Z.H. denied calling her on his phone but testified that he may have told J.R.P. to call her. He could not remember whether he spoke to Appellant to tell her that M.T.P. would not wake up. J.R.P. stated that she called her mother. Appellant testified that Z.H. called her from J.R.P.'s phone but the call was disconnected, so she called her daughter back. In any event, the testimony was consistent that J.R.P. and Appellant spoke on the phone soon after Z.H. found M.T.P.

[7]In a line of questions about whether someone else had moved the phone to the shoebox, J.R.P. did not give a definite answer, stating that "[m]aybe" she had put it in the shoebox; "[p]robably" someone else could have put it there; she did not know who moved it, if it had been moved; and, "[i]t might have been moved, but [she] put it on the top shelf in [her] closet."

9

previous statements to investigators, she could "wind up in juvy."[8]  According to J.R.P. she also needed to make her testimony match her previous statements because the State had granted her immunity for a charge of tampering with evidence, the immunity would be revoked if she lied in her trial testimony, and it was the State who would decide whether her testimony was truthful.[9]  She also admitted that her half-brother, Appellant's son, had texted her to ask her if she wanted Appellant to go to prison for the rest of her life and told her that "[i]f there's anything that we need to change, we need to do it now," to which she responded, "Tell me what to say because I don't know what to do."

Appellant testified in her own defense to contradict J.R.P.'s testimony and to provide an explanation for her texts to M.T.P.  She agreed that she had asked J.R.P. to get M.T.P.'s phone, but she claimed that it was so that she could look through the phone to figure out what had happened.  She stated that J.R.P. was mistaken about Appellant's having asked her to delete text messages.

As for the phone calls and text messages, Appellant testified that M.T.P. had called first just to have a general conversation and that he called back later asking if he could go to Jennifer's house to "pick up his weed pipe that was at [her] house."  She acknowledged that she had allowed M.T.P. to smoke marijuana at Jennifer's house,

___

[8]David's version of this conversation is that he told her, "if you get on the stand and you—you lie, you could possibly go to TYC."

[9]But on re-direct, she stated that she had not lied in her testimony.

explaining that she did so because she knew that he would use marijuana anyway, and she thought that he was safer doing it in her house than out on the streets. But because she knew that Jennifer "would not have been okay with him going there to pick up his weed pipe," she texted him to not tell Jennifer the purpose of his visit.

According to Appellant, in the next call from M.T.P., he "sounded funny," so she asked if he was high, and he said no. She further testified that he called back a few minutes later to tell her that he did not feel well, so she told him to take some Advil and lie down. Appellant claimed that her text telling M.T.P. to "[t]ake 1 now" and "another one" later was about the Advil.

Appellant was en route from Midland the next day when J.R.P. and Z.H. called her to tell her about M.T.P., and she went straight to David's house. When she arrived, David and J.R.P. were there along with paramedics and a sheriff's deputy. She denied telling J.R.P. to hide M.T.P.'s phone or knowing where J.R.P. put it, testifying that "when [she] arrived home that day and [she] was told [her] son died, [she] never thought anything about [the phone] again."

## C.    Analysis

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman*, 520 S.W.3d at 622. We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light

11

most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Murray*, 457 S.W.3d at 448–49. But a jury is not permitted to come to conclusions based on "mere speculation or factually unsupported inferences or presumptions." *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018) (quoting *Hooper v. State*, 214 S.W.3d 9, 15–6 (Tex. Crim. App. 2007)).

The jury had to resolve the conflict in Appellant's and J.R.P.'s testimony about whether Appellant had talked to M.T.P. about the morphine and whether Appellant had asked J.R.P. to delete her text messages. The jury could and apparently did find J.R.P. credible and Appellant not credible. The jury could have believed J.R.P.'s testimony that on the evening of January 15, M.T.P. had a phone conversation about the morphine with a woman who sounded like Appellant. And because M.T.P.'s phone records show that he spoke to his mother near the time that he went to his aunt's house for the morphine, and Appellant acknowledged that she had spoken to him around that time, the jury could have reasonably inferred that Appellant was the woman with whom he had spoken about the morphine. The jury could also have rejected Appellant's explanations for her text messages, believing instead J.R.P.'s testimony that Appellant told her to find M.T.P.'s phone and delete the texts. Having

12

reasonably inferred that Appellant had a conversation with M.T.P. about the morphine, the jury could have further reasonably inferred from the evidence that the text regarding the dosage amount was also related to the morphine. Between the phone calls and the text messages indicating that Appellant gave M.T.P. instructions on retrieving the morphine and how much of the morphine to take, the evidence at trial was sufficient to establish that Appellant either told 17-year-old M.T.P. where to find the morphine or gave him permission to take it. And it is undisputed that he found the morphine and took it home with him. Thus, the evidence was sufficient to support the jury's finding that Appellant constructively or actually transferred a controlled substance to a minor. We overrule Appellant's first issue.

## II. Sufficiency of the evidence as to deadly weapon finding

In her second issue, Appellant argues that the evidence was insufficient to support the jury's affirmative finding that she used or exhibited a deadly weapon. Specifically, she argues that the evidence was insufficient to establish that she used the morphine in a manner capable of causing death or serious bodily injury. She further argues that the rule of lenity requires this court to set aside the deadly weapon finding.

## A. Proving up a deadly weapon

We will sustain a deadly-weapon finding if the evidence shows that (1) the object meets the definition of a deadly weapon; (2) the object was used or exhibited during the transaction on which the felony conviction was based; and (3) other people were put in actual danger. *Brister v. State*, 449 S.W.3d 490, 494 (Tex. Crim. App. 2014).

A "deadly weapon" includes "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Tex. Penal Code Ann. § 1.07(17); *see also Prichard v. State*, 533 S.W.3d 315, 320–21 (Tex. Crim. App. 2017) (noting that that "a 'deadly weapon' may be 'anything,' and there is no limitation as to what type of thing may be considered a deadly weapon"). "Serious bodily injury" is "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." Tex. Penal Code Ann. § 1.07(46).

The sufficiency of the evidence supporting a deadly weapon finding depends on the specific testimony in the record about its manner of use. *See Yon v. State*, 440 S.W.3d 828, 831–33 (Tex. App.—Tyler 2013, no pet.). "Use" can mean *any* employment of the object alleged to be a deadly weapon. *Coleman v. State*, 145 S.W.3d 649, 652 (Tex. Crim. App. 2004) (quoting *Patterson v. State*, 769 S.W.2d 938, 941 (Tex. Crim. App. 1989).

## B.    Evidence of a deadly weapon

The medical examiner testified about the results of the autopsy she had conducted on M.T.P. First, she explained her toxicology findings. The level of morphine in M.T.P.'s body at the time of the autopsy was 0.115 milligrams per liter. A therapeutic level—what she would normally see in a patient prescribed morphine— is 0.02 milligrams per liter. The level of Xanax in M.T.P.'s body was 0.017 milligrams per liter, which is within the therapeutic range for that drug.

14

The medical examiner next explained to the jury the effects of opiates like morphine and benzodiazepines like Xanax. She testified that opiates can have a toxic effect because they "cause respiratory depression," acting "specifically on the brain stem to slow down your breathing. And once your breathing slows, that's when you get the buildup of fluid in the lungs. It makes it harder for you to get oxygen to the rest of your body." She explained that benzodiazepines have "basically the same mechanism of action" as opiates "where they will cause respiratory depression," and the combination of benzodiazepines and opiates has potentially harmful consequences. "[I]nstead of having an additive effect where if you take one and you take the other, it's two times, it's more of an exponential effect. So it might be four times as—as depressing to the respiratory system."

Finally, she opined that M.T.P. died from the toxic effects of the combination of morphine and Xanax, that she had seen no other cause for his death other than the effects of the controlled substances in his system, and that, based on M.T.P.'s health at the time, she had no reason to believe that he would have died then had he not taken the morphine. She further stated that in her opinion, the morphine that M.T.P. ingested was a deadly weapon.

On cross examination, the medical examiner acknowledged that neither the amount of Xanax in M.T.P.'s body nor the morphine, standing alone, was at a level

15

that is considered fatal.[10]  Rather, it was the combined effect of the drugs that led to his death.  She was not asked to give her opinion on whether two morphine tablets would have been fatal, but it would be reasonable to infer that if she did not consider nine tablets to be a fatal dose, two tablets would not have been, either.

## C.    Analysis

As Appellant notes in her brief, to constitute a deadly weapon in this case, the morphine had to be capable of causing serious injury or death by its use or intended use.  *See* Tex. Penal Code Ann. § 1.07(a)(17)(B).  It is the defendant's use that matters for this determination.  *See Rodriguez v. State*, 31 S.W.3d 772, 778–79 (Tex. App.—Austin 2000) (relying, for purposes of reviewing deadly weapon finding, on the defendant's use of cocaine rather than the use of the cocaine by the person who ultimately ingested it), *aff'd*, 104 S.W.3d 87 (Tex. Crim. App. 2003).

Appellant's first argument under this issue focuses on the fact that the medical examiner agreed that neither the Xanax nor the morphine would have been fatal on its own.  She argues that "[m]orphine was the only substance for which [she] could arguably be held responsible" because there is no evidence that Appellant provided

---

[10]The State asked the medical examiner on re-direct if it was "fair to say that somebody who has never used opiates is going to have a lower tolerance to somebody who uses opiates frequently" and whether that could "have had some impact with regards to [M.T.P.]," and "[t]hat might have been a lethal amount" for him.  She responded that she "d[id]n't know anything . . . of his drug history," "but if he were naïve to it, then yes."  There was no evidence of M.T.P.'s prior history with opiates, and the medical opinion that she offered as to his cause of death was that he died from the toxic effects of both drugs.

M.T.P. with Xanax and that the particular facts of this case do not support a finding that she intended to cause serious bodily injury or death or that she knew that the morphine would be combined with another substance.

Appellant is correct that the State produced no evidence that she knew that M.T.P. would be taking the morphine tablets after having taken Xanax. But Appellant "used" the morphine by transferring possession of it to her teenage son with express permission to take some while he was home without adult supervision. The medical examiner testified about the toxic effects that opiates can have on the body. Giving an underaged child unfettered access to and express permission to take a potentially deadly drug—not only without any adult supervision whatsoever but also while in the presence of other underage children—was sufficient evidence to support a finding that the manner of Appellant's use of the morphine was capable of causing death or serious bodily injury. *Contra id.* (holding that defendant did not use cocaine as a deadly weapon when he prepped a small amount for his teenage daughter to use and watched while she ingested it).

Appellant makes two more arguments under this issue. First, citing *In re M.S.*, No. 02-11-00041-CV, 2012 WL 335864, at *3 (Tex. App.—Fort Worth Feb. 2, 2012, no pet.) (mem. op.), Appellant asserts the rule of lenity should apply and argues that "the ambiguity in whether M.T.P.'s ingestion of morphine—without the Xanax delivered by an unknown person **other than the Appellant**—would have caused his death, should be resolved in favor of lenity."

17

The rule of lenity applies "when a criminal statute is ambiguous and the intent of the legislature cannot be determined by employing statutory construction can[]ons." *Id.* at *3. Under those circumstances, the rule requires that the ambiguity be resolved in favor of lenity. *Id.* But here, while Appellant argues that the *evidence* is ambiguous, she fails to articulate how any applicable statute is. To the extent that Appellant intended to argue that the statutory definition for "deadly weapon" is ambiguous, we disagree. While the evidence in a particular case might make it difficult to determine if an object is a deadly weapon under the facts of that case, the statute itself is clear and unambiguous. *See Moore v. State*, 520 S.W.3d 906, 908 (Tex. Crim. App. 2017) (noting the provision's plain language). And here, the evidence was not ambiguous. The medical examiner clearly testified that the amount of morphine in M.T.P.'s body, though not fatal on its own, had in combination with the Xanax caused M.T.P.'s death. It is irrelevant whether Appellant's giving the morphine to M.T.P. would not have led to his death if he had not also taken Xanax because Appellant's giving M.T.P. morphine on a day when he *had* taken Xanax—the manner in which the morphine was actually used in this case—was deadly.

Second, Appellant argues in one sentence that "in this case, Appellant's conduct was punished twice in the finding that she delivered morphine to a minor resulting in his serious bodily injury or death, and, the finding that morphine was a deadly weapon in the manner of its use." Construing this sentence as arguing that the application of both enhancements was impermissible, we disagree. A finding under

18

Texas Health and Safety Code Section 481.141 raises the level of an offense so that a higher maximum sentence may be imposed, while a deadly weapon finding affects a defendant's eligibility for community supervision and parole. *See* Tex. Code Crim. Proc. Ann. art. 42A.054(b); Tex. Gov't Code Ann. § 508.145(d). This is not a situation in which a defendant faces two separate punishments after a conviction for two separate offenses covering the same conduct. *See, e.g.*, *Villanueva v. State*, 227 S.W.3d 744, 747–49 (Tex. Crim. App. 2007) (discussing the Fifth Amendment's protection against double jeopardy). The two special issues affect different aspects of punishment and did not result in Appellant's being punished twice for the same conduct.

Because the evidence was sufficient to support the deadly weapon finding, we overrule Appellant's second issue.

## III.  Venue challenge

In her third issue, Appellant argues that she was entitled to a venue change as a matter of law because the State did not controvert her motion to change venue and that the trial court therefore erred by failing to move the case to Wise County.

Under Code of Criminal Procedure Article 31.03, a defendant may move for a change of venue upon the trial court's determination "[t]hat there exists in the county where the prosecution is commenced so great a prejudice against him that he cannot obtain a fair and impartial trial" or [t]hat there is a dangerous combination against him instigated by influential persons, by reason of which he cannot expect a fair trial."

19

Tex. Code Crim. Proc. Ann. art. 31.03(a). A defendant's filing of a motion for change of venue, supported by affidavits, raises a fact issue for the trial court to resolve. *McManus v. State*, 591 S.W.2d 505, 516 (Tex. Crim. App. 1979), *overruled on other grounds by Reed v. State*, 744 S.W.2d 112 (Tex. Crim. App. 1988). But if the State does not file a controverting affidavit, there is no fact issue to be resolved, and the defendant is therefore entitled to a change of venue as a matter of law. *Id.*

Although "a question of a change of venue is a question of constitutional dimensions," *Foster v. State*, 779 S.W.2d 845, 852 (Tex. Crim. App. 1989), a defendant may waive any right she has to a venue change. *McManus*, 591 S.W.2d at 516 (holding that defendant waived right to change of venue as a matter of law by proceeding to a hearing on the motion without objecting that he was entitled to the change as a matter of law, thereby allowing the trial court to hear the merits of the issue); *cf. Gutierrez v. State*, 979 S.W.2d 659, 663 (Tex. Crim. App. 1998) (holding that the appellant waived his controverted motion for change of venue "when he ceased to advocate or advance his position that he wanted a hearing to establish his right to a change of venue as a matter of fact").

Nothing in the record indicates that Appellant sought a hearing on her venue motion. The trial court did not rule on it. And the case proceeded to trial and then to judgment without any order addressing the venue question.[11] Because the record

---

[11]In a pretrial hearing, Appellant's attorney told the trial court, in the context of explaining that Appellant had elected to have the jury assess punishment, "we're not

20

contains no indication that Appellant ever requested a hearing on her motion or asserted her right to a venue change as a matter of law, we hold that Appellant waived her right to a change of venue. Accordingly, we overrule her third issue.

## Conclusion

Having overruled Appellant's three issues, we affirm the trial court's judgment.

/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: September 3, 2020

---

waiving our claim that—that we don't—that we cannot get a fair trial from the jury in Jack County." But no other discussion or mention of a venue change occurred at that hearing.